NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 29

No. 24-AP-337

| | |
|---|---|
| Anne Jackson and Jeffrey Jackson | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Addison Unit, |
| | Civil Division |
| | |
| Willard Jackson and Willard Jackson as | May Term, 2025 |
| Trustee for the William Jackson Trust of | |
| 1939 and the William Jackson Trust of 1941 | |

Mary Miles Teachout (Ret.), J.


Mark V. Franco and Maureen Sturtevant of Drummond Woodsum, Portland, Maine, for
  Plaintiff-Appellant.

Peter F. Langrock, Wendy E. Radcliff, and Vincent J. Todd of Langrock Sperry & Wool, LLP,
  Middlebury, for Defendants-Appellees.


PRESENT:  Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.


¶ 1.     **EATON, J.**   Petitioners Anne and Jeffrey Jackson sought to remove their father Willard Jackson as trustee of two trusts for which Willard is an income beneficiary and they are remainder beneficiaries.  Petitioners sought to terminate Willard's beneficial interest in the income of the trusts, terminate the trusts, and distribute the trust assets to the beneficiaries based on an allegation of breach of trust.[1]  Petitioners also sought to have Willard pay restitution to the trust

---

[1] Because the parties share the same last name, we refer to them by their first names in this opinion.

from his personal assets to restore the value of the trust assets that they argued were improvidently spent. Petitioners initiated their action in the probate division in April 2021 against Willard individually and in his capacity as trustee. The probate division granted their request to remove Willard as trustee and granted petitioners' request for attorney's fees from Willard personally under 14A V.S.A. § 1004. Willard appealed to the civil division, which considered the matter de novo. Following a five-day bench trial, the civil division rejected petitioners' arguments and granted judgment to Willard. The court also granted Willard's request for attorney's fees from petitioners pursuant to 14A V.S.A. § 1004. Petitioners appeal, arguing that the court erred in rejecting their claims and in awarding attorney's fees to Willard. We affirm.

## I. Merits Decision

### A. Factual Findings

¶ 2. The trial court made numerous findings, including the following. Willard's father (William) established trusts in 1939 and 1941 for the benefit of his two children (Willard Jackson and Carolyn Grube) as income beneficiaries during their lives and for the benefit of his grandchildren as remainder beneficiaries upon the deaths of Willard and Carolyn. William established numerous other trusts as well. When William died in 1974, Willard and Carolyn each became income beneficiaries. Willard's children (Susan, Jeffrey, and Anne) and Carolyn's children (Chris, Paul, Marianne, and Peter) became remainder beneficiaries. Willard became trustee or co-trustee of most of William's trusts, including those relevant here, labelled Trusts 1, 2, 3, and 4. At that time, the trust assets consisted primarily of securities and investments in second mortgages and the trust provisions gave the trustees broad power over investments. Jeffrey and Anne, along with their sibling Susan who is not a party to this suit, are remainder beneficiaries of Trusts 2 and 4. Carolyn's children are the remainder beneficiaries of Trusts 1 and 3.

¶ 3. When Carolyn died, Willard continued as the income beneficiary of Trusts 1-4. Upon Willard's death, the corpus of Trusts 1 and 3 will go to Carolyn's four children in equal

2

shares, and the corpus of Trusts 2 and 4 will go to Willard's three children in equal shares. Willard had other assets and investments and did not need to rely on the income from the trusts. Willard chose and managed investments for future growth rather than generating income for himself.

¶ 4. Willard was ninety-six years old at the time of the bench trial but he did not present with any diminished capacity. He testified extensively at trial on three separate days. The court found that Willard testified with clarity and in detail about the facts and financial history of numerous trusts, assets, and investments, as well as trust provisions, the reasons behind his investment decisions, tax consequences, and the extent to which goals were realized from various investments. The court found Willard's trial testimony credible and reliable and found that his investment decisions over the years resulted in overall increased value of assets. The court contrasted this with petitioners, who did not have a good understanding of how investments work, and who provided no testimony from a person knowledgeable about real estate values and investments.

¶ 5. In 1986, Willard and his co-trustee, on behalf of Trusts 1-4, purchased an 840-acre tract of land with one mile of frontage on the California coast that included a cattle ranch, timberland, a rock quarry and an old farmhouse. A corporation entitled "Jackson-Grube Family Inc." was formed to own the land. Each of the four trusts acquired 25% of the shares of the corporation. The property was purchased as an investment asset and petitioners did not dispute that the purchase of this land was a good investment.

¶ 6. That same year, the co-trustees pooled all the Jackson-Grube investments together, including investments in trusts other than Trusts 1-4. This allowed them to take advantage of investment opportunities with mandatory minimum amounts that would yield higher returns than if the assets in each trust were handled separately. In 1998, "The Jackson Grube Limited Partnership" was formed to hold the pooled assets, which then consisted mostly of stocks and fixed income securities. Trusts 1-4 each hold a percentage interest in the Limited Partnership, as do

3

other trusts that were established by William and managed by Willard. Meticulous accounting records were kept to maintain the integrity of each trust's assets. In 1993, the value of the pooled family assets managed by Willard (of which Trusts 1-4 are a part) was $52 million, having risen from $20 million at the time of William's death in 1974. By the end of 2022, the value was $122 million. Trust 2 held a 13.411% interest in the Jackson-Grube Limited Partnership (among other assets); Trust 4 held a 11.105% interest in the Limited Partnership.

¶ 7.    Over the years, the co-trustees of Trusts 1-4 enlarged the California property by purchasing seven adjacent parcels. The site now consists of 2,050 acres with one-and-a-half miles of ocean frontage. The property includes 1000 acres of range land on which there is an operating cattle ranch, 1000 acres of timber land, and an income-producing rock quarry. It also includes an inn, discussed in greater detail below.

¶ 8.    In 2006, following a discussion and with the opportunity to consult with appropriate advisors, Anne, Jeffrey, and the other remainder beneficiaries voluntarily created "dynasty trusts" to allow their heirs to avoid inheritance taxes on the intergenerational transfer of the California land. Chris Grube and Willard as co-trustees of the dynasty trusts executed a shareholders agreement with Jackson-Grube Family Inc. for the transfer of shares in the Jackson-Grube Family Inc., which owned the California land, to the dynasty trusts in exchange for promissory notes. Willard provided the funds to pay the annual interest on the notes. In executing the documents to implement this plan, the remainder beneficiaries gave up the opportunity to receive, upon Willard's death, a distribution from the trusts in the form of shares in the Jackson-Grube Family Inc. corporation that owns the land. They did so to pass the interest in the land value to their own children without having to pay inheritance taxes on the full amount of the appreciated land value.

¶ 9.    In 2006, shortly after the creation of the dynasty trusts, Willard and Chris Grube as co-trustees of Trusts 1-4 created a California LLC named "Inn at Newport Ranch, LLC" and they executed an operating agreement for managing the inn. The operating agreement requires

4

agreement of 75% of its members for the inn to be sold. The inn project was not intended to generate income but to be a family project that would be self-sustaining while the land value appreciated. At family meetings in 2005 and 2006, before any money was spent on building the inn, the plan for the operation of the inn was reviewed with all beneficiaries, including that it would not be for the purpose of generating income but was planned to at least cover expenses. Willard believed that there was consensus among the seven cousins to build the inn.

¶ 10. The money for the design, permitting, and construction of the inn came from assets in Trusts 1-4 and costs exceeded expectations. The court found that approximately $5 million of assets from each of Trusts 2 and 4 was used to fund development of the inn. The inn was partially completed and opened in 2015. Operating expenses for the inn have not been covered by cash flow except for 2021. The operating cost shortfalls were covered by Willard and the Grubes and, at the time of the court's decision, the interests of the remainder beneficiaries had not been compromised by the operating losses. Willard believed that the land and inn would prove to be a great investment in the long run.

¶ 11. Jeffrey and Anne sought to remove Willard as trustee, dissolve Trusts 2 and 4, and require Willard to pay $5 million each to Trusts 2 and 4 to restore what was spent on the inn. They asserted that Willard was not a careful steward of the assets, used trust assets for his own personal inn project, and was not honest with the family. Petitioners questioned whether Willard should maintain assets in the trusts with potential long-term value; they favored common stocks that could be immediately traded. Petitioners also preferred that the trusts hold assets that were separately managed rather than pooled. Petitioners apparently believed that the trusts should hold investments that would provide them with immediate liquidity and flexibility upon Willard's death. The court noted that this final argument was inconsistent with the type of investments that were historically held by the trusts.

5

¶ 12.   For numerous reasons detailed in its decision, the court rejected petitioners'

contention that Willard acted improperly in developing the inn.  It found that petitioners failed to

show an overall diminution in the value of the trust assets, and they failed to show that Willard

diverted any trust assets for his own use.  The court determined that Willard exercised responsible

judgment in his decision making and acted within the authority provided to him under the trust

instruments, including the authority to invest in long-term growth assets.  The court added that,

with respect to the claim regarding honesty, Willard had gone above and beyond his obligation as

trustee by organizing annual family meetings where independent advisors were present to describe

and explain investments and plans, with the information memorialized in minutes that were kept

and distributed.

## B. Legal Conclusions

¶ 13.   Based on these and numerous other findings, the court considered petitioners' legal

claims.  It set forth the law with respect to removal of a trustee, termination of a trust, and

restitution to a trust of funds that were allegedly improvidently spent.  See 14A V.S.A. §§ 706

(trustee removal), 1001 (remedies for breach of trust), 411-12 (termination of a trust).  The court

considered whether New York (where the trusts were created and where the trusts pay taxes) or

Vermont law (where Willard resides) governed Willard's conduct as trustee and the related issue

of available remedies.  It concluded that the outcome would be the same, regardless of which law

applied.  Both Vermont and New York have adopted a version of the Uniform Prudent Investor

Act.  See 14A V.S.A. §§ 901-908; N.Y. Est. Powers & Trusts § 11-2.3 (McKinney 2025).  The

court identified the standard, see 14A V.S.A. § 902(a)-(e), and explained that "[c]ompliance with

the prudent investor rule is determined in light of the facts and circumstances existing at the time

of a trustee's decision or action and not by hindsight."  Id. § 905; see also N.Y. Est. Powers &

Trusts § 11-2.3(b)(1)-(4).

¶ 14. Petitioners argued that Willard's investment in the inn breached his duties as trustee because: the sole purpose of the inn was to create a project for the family that would never generate a return on the investment; he mismanaged the project; and he pursued the project out of vanity rather than with regard for the beneficiaries' interests. They further alleged that Willard breached his duty by making Trusts 2 and 4 minority members of the Inn at Newport Ranch, LLC because, when the trusts terminate, petitioners will become minority members who will "be obligated to subsidize the ongoing losses of the Inn." Petitioners claimed that Willard also breached his duties by transferring a portion of the value of the land from Trusts 2 and 4 to the dynasty trusts in exchange for promissory notes that would not be paid unless the dynasty trusts sell the land. Finally, petitioners argued that by investing assets in the Jackson-Grube Limited Partnership, Willard breached his fiduciary duty by commingling trust assets such that petitioners would become limited partners in an investment partnership, and it would become difficult to withdraw from the limited partnership when Willard died.

¶ 15. The court found these arguments unsupported by the facts. It held that Willard had brought his considerable and successful investment experience to bear on his decisions in investing the assets of Trusts 2 and 4, including investment in the California land and, later, the inn. With respect to the concern about commingling trust assets with those of other trusts, the court found that accounting had been done properly to maintain the integrity of each trusts' assets. Professionally prepared financial documents precisely described the fractional interest holdings of each trust, reflecting careful accounting as to the specific holdings of each trust. The purpose of the Limited Partnership was to benefit from enhanced investment opportunities, which had been successful when viewed as a whole, and the accounting protected the asset value interest of each trust. While petitioners expressed concern that they would acquire a minority interest in the future, there was no evidence that the investments held by Limited Partnership could not be distributed according to percentage interests with accuracy and integrity.

7

¶ 16. As to the possibility of distribution of minority interests in the Inn at Newport Ranch, LLC, the court found it premature to conclude that such distributions were inevitable because the sale of the entity could occur during Willard's life. More importantly, the court continued, petitioners identified no law that would preclude distribution to a remainder beneficiary of a minority interest in an LLC. Indeed, if Willard had died when the trusts held second mortgages and/or property purchased based on second mortgages, which was authorized, the remainder beneficiaries would most likely have acquired minority interests in business properties. Additionally, if the California land had not been developed at all but continued to appreciate and there had been no dynasty trusts, upon Willard's death, each of the seven cousins would have had a minority interest in Jackson-Grube Family, Inc., which owned the land. Petitioners provided no legal authority for the proposition that distribution of a minority interest in an asset constituted a violation of a trustee's duty to remainder beneficiaries.

¶ 17. With respect to the inn, the court found that its value was part of the entire real estate package that included the land as well as the inn, and the package as a whole was reasonably expected to appreciate in value to the benefit of the trusts and, ultimately, the beneficiaries and their heirs. The court explained that investment portfolios could be made up of assets designed for income and others designed for growth. The California assets, including the land and the inn, fell into the growth category. This primarily benefited the remainder beneficiaries and did not show that the trustee violated a duty to the remainder beneficiaries. The facts supported the conclusion that the investments complied with Willard's duties under Vermont and New York law.

¶ 18. As to the creation of dynasty trusts and exchange of shares for promissory notes at discounted value, the court found there was no coercion and petitioners had ample time and opportunity to consider and seek advice about their decision. They consented in writing by executing the necessary documents. Contrary to petitioners' assertion that the value was lost,

8

petitioners had voluntarily passed the value to their heirs to avoid the possibility of high inheritance taxation that would otherwise fall on their heirs.

¶ 19. The court further found that the overrun in construction costs at the inn did not, by itself, show mishandling of funds. Petitioners failed to show that the combined value of the land and the inn was less than reasonable in light of the investment. Nor did the evidence support petitioners' theory that vanity was the driving motivation for the project or that Willard acted in any way other than in good faith in administering the parties' assets. The court found that Willard had a long history of responsible money management and he continued to consider the possibility of selling the California property versus holding onto it for expected appreciation and coverage of operating costs.

¶ 20. The court explained that under both Vermont and New York law, an evaluation of Willard's duty as a prudent investor involved consideration of the entire portfolio, not just an isolated investment that by itself did not provide a high rate of return. The evidence suggested that the total value of the California property might now or in the future exceed the amount invested in it. Petitioners did not establish a violation of the prudent investor rule as to this asset. Additionally, Vermont law, on which petitioners relied, was specific that "[a] trustee's investment and management decisions respecting individual assets must be evaluated not in isolation but in the context of the trust portfolio as a whole and as part of an overall investment strategy having risk and return objectives reasonably suited to the trust." 14A V.S.A. § 902(b). The court concluded that Willard managed trust assets in a way that had generated and continued to generate growth overall and amply provide for the beneficiaries' interests. Petitioners did not meet their burden to show otherwise.

¶ 21. The court thus concluded that petitioners failed to show that Willard breached any duty as trustee under either Vermont or New York law or that there was any basis to remove him as trustee, order him to repay funds to the trusts, or terminate the trusts. It subsequently granted

Willard's request for $212,508.50 in attorney's fees and related litigation costs from petitioners. This appeal followed.

## C. Arguments on Appeal

¶ 22. At the outset, we clarify our standard of review. We have explained that:

> This Court's review of a trial court's findings . . . following a bench trial is limited. A trial court's factual findings will not be disturbed on appeal unless clearly erroneous when viewed in the light most favorable to the prevailing party. A finding will not be disturbed merely because it is contradicted by substantial evidence; rather, an appellant must show there is no credible evidence to support the finding. This Court gives due regard . . . to the opportunity of the trial court to judge . . . the credibility of the witnesses, and will accordingly defer to the court's determinations regarding the credibility of witnesses and . . . the persuasive effect of the evidence. Finally, a trial court's conclusions will be affirmed where they are reasonably drawn from the evidence presented.

Lofts Essex, LLC v. Strategis Floor & Décor Inc., 2019 VT 82, ¶ 17, 211 Vt. 204, 224 A.3d 116 (quotations and alteration omitted).

¶ 23. The arguments here involve fact-specific inquiries, appropriately subject to the deferential standard of review cited above. This case does not present pure questions of law subject to de novo review. To the extent that we suggested otherwise in Kuhling v. Glaze, 2018 VT 75, ¶ 11, 208 Vt. 273, 196 A.3d 1125, the language to that effect conflicts with Lofts Essex, LLC and is overruled.

¶ 24. Petitioners also ask this Court to consider the probate decision as persuasive. We decline to do so. The trial court here conducted a de novo bench trial and the trial court's decision is the only decision before this Court on appeal.

¶ 25. We thus turn to the merits. Petitioners largely reiterate arguments considered and rejected below. According to petitioners, Willard breached his fiduciary duty by improperly managing the assets of Trusts 2 and 4 as "global family assets" and putting the interests of the Jackson-Grube family and himself above the trust beneficiaries. They also challenge the transfer

to the dynasty trusts and raise concerns about minority ownership in the Limited Partnership and the inn.[2]

¶ 26. Petitioners' arguments rest on factual premises considered and rejected by the trial court in its role as factfinder. As set forth above, the court rejected the argument that Willard put the interests of the Jackson-Grube family as a whole, and the interests of other individuals, ahead of petitioners' interests. As to the pooling of various trust assets within the Limited Partnership, the court found that the Limited Partnership successfully served to enhance investment opportunities and that accountings had been done to protect the integrity of each trust's interests. It determined that the Limited Partnership's assets could be distributed according to percentage interests with accuracy and integrity. This served the interests of the remainder beneficiaries. As the trial court determined, Willard managed trust assets in a way that had generated and continued to generate growth overall and amply provided for its beneficiaries' interests. The court rejected petitioners' argument that Willard's sole purpose for investing in the inn was to create a project for the family or that he pursued the project out of vanity rather than with regard for the interests of beneficiaries. The trial court did not find that the assets of Trusts 2 and 4 were converted "into unmarketable minor ownership interests and loans that would never be paid," as petitioners assert.

¶ 27. With respect to the possibility of distribution of minority interests in the inn at Newport Ranch LLC, the court found it premature to conclude that distributions of minority

---

[2] Petitioners further contend that Willard's conduct violated the "uses and purposes" of Trusts 2 and 4, which are to "hold, manage, sell, invest and reinvest the said property and to collect and receive the income and principal accruing therefrom," and upon Willard's death, to "pay and distribute the [principal] . . . and all undistributed income" to its beneficiaries "absolutely and forever." They argue that "absolutely and forever" means that the remainder beneficiaries must "receive the trust corpus free of trust in sole ownership." Petitioners fail to show that they raised this argument below and we therefore do not address it. See In re S.B.L., 150 Vt. 294, 297, 553 A.2d 1078, 1081 (1988) ("It is the burden of the appellant to demonstrate how the lower court erred warranting reversal. We will not comb the record searching for error."); see also V.R.A.P. 28(a)(4) (explaining that argument on appeal must contain "the issues presented" and "how they were preserved," "with citations to . . . parts of the record on which the appellant relies").

11

interests were inevitable because sale of the entity could occur during Willard's life. More importantly, petitioners provided no legal authority that would preclude distribution to a remainder beneficiary of a minority interest in an LLC. The court noted that, historically, the trusts held these types of investments. The court also considered and rejected the argument that petitioners lost the "value" of the California land when they voluntarily created the dynasty trusts to allow their children to benefit from the appreciation in land value.

¶ 28. Petitioners fail to show that the court's findings are clearly erroneous. Petitioners essentially challenge the trial court's assessment of the weight of the evidence and the credibility of witnesses and we do not reweigh the evidence on appeal. See Mullin v. Phelps, 162 Vt. 250, 261, 647 A.2d 714, 720 (1994) (reiterating that Supreme Court's "role in reviewing findings of fact is not to reweigh evidence or to make findings of credibility de novo"). Petitioners further assert that the court erred in looking at the inn investment as part of a broader investment package. They argue that they do not have an interest in the "entire real estate package." The court found, and the record shows, that petitioners made the choice voluntarily to transfer the land interest in 2006 to the dynasty trusts to benefit their own children. In any event, the court did not err in considering this asset among other assets managed as part of the trusts in evaluating Willard's conduct with respect to the prudent investor rule. As the trial court explained, "[a] trustee's investment and management decisions respecting individual assets must be evaluated not in isolation but in the context of the trust portfolio as a whole and as part of an overall investment strategy having risk and return objectives reasonably suited to the trust." 14A V.S.A. § 902(b).

¶ 29. Finally, petitioners argue that the court considered irrelevant facts and ignored other facts in reaching its decision, including Willard's loans of $4.8 million to petitioners from the Limited Partnership and the forgiveness of significant interest on those loans, Willard's supportive actions as a parent and grandparent, and Willard's community contributions. They reiterate their argument that Willard was motivated by vanity in pursing the California project. These arguments

12

challenge the trial court's evaluation of the weight and persuasiveness of the evidence and we reject them. See Lofts Essex, LLC, 2019 VT 82, ¶ 17.

¶ 30. While petitioners disagree with the trial court's conclusions, they do not demonstrate error. The court applied the appropriate legal standard. Its findings are supported by the record, and the findings in turn support the court's conclusions. We have considered all of petitioners' preserved arguments and find them all without merit. We therefore affirm the court's decision in Willard's favor.

II. Attorney's-Fee Award

A. Trial Court's Decision

¶ 31. With respect to the award of attorney's fees, the record indicates the following. Two weeks after the merits decision in his favor, Willard moved for attorney's fees under 14A V.S.A. § 1004 of the Vermont Trust Code, which is based on the Uniform Trust Code. Section 1004 provides:

> In a judicial proceeding involving the administration of a trust, the Probate Division of the Superior Court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy.

¶ 32. Willard asserted that there did not appear to be any Vermont precedent directly interpreting § 1004. He cited Atwood v. Atwood, 2001 OK CIV APP 48, ¶ 45, 25 P.3d 936, which considered the meaning of the terms "as justice and equity may require" from the Uniform Trust Code. The Atwood court found that this "highly subjective phrase" "connotes fairness and invites flexibility in order to arrive at what is fair on a case by case basis." Id. ¶ 47. It referenced "general criteria drawn from other types of cases" as "provid[ing] nonexclusive guides," including: "(a) reasonableness of the parties' claims, contentions, or defenses; (b) unnecessarily prolonging litigation; (c) relative ability to bear the financial burden; (d) result obtained by the litigation and

prevailing party concepts; and (e) whether a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons in the bringing or conduct of the litigation." Id. ¶ 47.

¶ 33.     Willard also cited a law review article that supported applying the Atwood factors in attorney's-fee-award assessments under 14A V.S.A. § 1004. See K. Henry, Attorney Fee Awards in Litigation between Trustees and Beneficiaries, 39 Vt. Bar J., Summer 2013, at 19. In that article, the author argued that the language in § 1004 "is very broad and appears to give courts significant discretion to formulate a remedy to address the issue of attorney fees," and it "suggests that the Trust Code is departing from common law and setting a lower bar to justify a fee award from one party to another." Id. at 20. The author concluded that "the five Atwood factors [had] been well received and appear[ed] to be the preferred criteria to apply in the section 1004 'justice and equity' analysis" "[a]nd for good reason." Id. at 23.

¶ 34.     Willard emphasized the court's broad discretion in awarding fees and argued that, using the Atwood guidelines to apply § 1004, he was entitled to an award of attorney's fees. He explained that counsel had been retained in April 2021 to defend him in this matter, the court had dismissed petitioners' claims, and the case had a lengthy history including a three-day trial in the probate division and a five-day trial in the civil division. With respect to the first Atwood factor, he argued that it was clearly appropriate for him to defend the case brought by petitioners. He argued that petitioners' suit was not reasonably pursued and it was done to intimidate him into terminating the trust prematurely to allow petitioners to receive their remainder shares before, rather than after, his death, which directly violated the terms of the trust. As to the second factor, although neither party intended to prolong the case, it was by its nature a very lengthy process. Willard asserted that both parties had the ability to bear the financial burden but questioned why he should have to bear this burden under the circumstances. Willard noted that he was the prevailing party and that he had obviously acted in good faith through the litigation. He argued that petitioners baselessly accused him of being dishonest, which was hurtful and intended to

14

intimidate him and force him to make concessions to petitioners that they were not otherwise entitled to receive. Willard stated that the fees had been paid by the partnership—presumably the Limited Partnership—in which Trusts 2 and 4 had an ownership interest. He argued that the Grubes and petitioners' sister should not have to bear the consequence of paying Willard's attorney's fees when they played no part in the litigation initiated by petitioners. He added that petitioners would benefit from the Limited Partnership paying his fees given the trusts' ownership stakes in the Limited Partnership. Willard thus asked for an award of fees from petitioners, and counsel attached an affidavit outlining the work done since April 2021 as well as billing statements.

¶ 35. Petitioners opposed the request, referencing the factors above, and arguing that the court should exercise its "considerable discretion" to deny Willard's request. Petitioners argued that they brought their case in good faith and with sincere belief in their claims. They noted, with respect to this issue, that the probate division had found in their favor. Petitioners acknowledged that the civil division considered the matter de novo but asserted that the court could consider the outcome of the probate proceeding "when assessing the reasonableness of the claims and whether [p]etitioners acted in good faith." Petitioners argued that each of the remaining Atwood factors also weighed in favor of requiring each side to bear their own attorney's fees. They asserted that neither party unnecessarily prolonged the litigation, and that if anyone was better positioned to bear the financial burden, it was the Limited Partnership because Willard had pursued the inn as a long-term investment and not one that was necessarily designed to produce income, which was not needed. Petitioners also noted that in his motion, Willard misstated petitioners' ownership interests in Trusts 2 and 4 (mistakenly stating that they each had a 1/6 interest) and mistakenly stated that half of the corpus of Trusts 2 and 4 was held by Carolyn's children (the Grubes). Petitioners indicated that the court was aware of who held the ownership interest in the trusts, citing to the court's merits decision. Finally, petitioners argued that if the Limited Partnership had paid Willard's attorney fees, awarding Willard fees would be an inappropriate windfall.

15

¶ 36. Based on its analysis of the <u>Atwood</u> factors as applied to this case, the court granted Willard's motion in the full amount requested pursuant to 14A V.S.A. § 1004 for the reasons set forth in Willard's motion and the article in the Vermont Bar Journal cited in the motion. The court declined to reduce the amount based on the result in the probate division, finding that to have been a necessary part of the procedure in the case and one that required a defense on the part of the trustee. There was no objection to the time spent or the rates charged or the expenses, and the court found that the fees appeared reasonable in relation to the needs of the case. The court took no position on the source of the funds used to pay Willard's attorney. It awarded Willard attorney's fees and related litigation costs in the amount of $212,508.50 both personally and in his capacity as trustee.[3]

### B. Arguments on Appeal

¶ 37. Petitioners first argue that the attorney's-fee award should be reversed because Willard was required to show bad faith and failed to do so. They contend that the Court should apply the same standard as that which applies to an award of attorney's fees pursuant to a court's inherent equitable powers, namely "conduct that could be described as in bad faith, vexatious, wanton, oppressive, or unreasonably obstinate." <u>Town of Milton Bd. of Health v. Brisson</u>, 2016 VT 56, ¶ 30, 202 Vt. 121, 147 A.3d 990 (quotation omitted).

¶ 38. Petitioners fail to show that they raised this argument below and we therefore do not address it. Petitioners' opposition to the attorney's-fee award rested on the application of the <u>Atwood</u> factors; they did not argue that a different standard should apply. They therefore waived this argument. See <u>Bull v. Pinkham Eng'g Assocs. Inc.</u>, 170 Vt. 450, 459, 752 A.2d 26, 33 (2000) ("Contentions not raised or fairly presented to the trial court are not preserved for appeal.").

---

[3] We note that neither party argued below or on appeal that New York law should govern the award of attorney's fees.

¶ 39. If a showing of bad faith is not required, petitioners argue that there is no basis in "justice or equity" for the award. Petitioners acknowledged below the court's wide discretion in determining whether to award attorney's fees under § 1004. See generally <u>Spooner v. Town of Topsham</u>, 2010 VT 71, ¶ 7, 188 Vt. 293, 9 A.3d 672 ("Due to the fact-specific nature of the analysis, this Court grants trial courts wide discretion in determining attorney's fees."); see also <u>In re Estate of King</u>, 920 N.E.2d 820, 827 (Mass. 2010) (recognizing trial court's broad discretion in awarding fees under standard "as justice and equity may require"). On this point, petitioners essentially challenge the court's assessment of the evidence. We do not reweigh the evidence on appeal.

¶ 40. Petitioners further assert that the court did not make sufficient findings to support its award, and that it erred to the extent that it relied on the assertions in Willard's motion concerning ownership of the trusts.

¶ 41. While the court's findings are not extensive, it provided a reasoned basis for its decision and acted within its discretion in awarding fees. We view the court's findings "in the light most favorable to the prevailing party," <u>Stickney v. Stickney</u>, 170 Vt. 547, 548, 742 A.2d 1228, 1230 (1999) (mem.), and we construe the findings "so as to support the judgment, if possible," <u>Armstrong v. Hanover Ins. Co.</u>, 130 Vt. 182, 185, 289 A.2d 669, 671 (1972). As set forth above, the court considered the <u>Atwood</u> factors and credited the arguments in Willard's motion and the law review article he cited. In reaching its decision, the court was not required to resolve how Willard's fees had been paid up to that point; there was no specific evidence presented on this point beyond a general allegation in Willard's motion. We can discern from the court's decision "what was decided and why," which is the purpose of findings. <u>In re UPC Vt. Wind, LLC</u>, 2009 VT 19, ¶ 30, 185 Vt. 296, 969 A.2d 144 (recognizing that "purpose of findings is to provide a clear statement as to what was decided and why"). We note, moreover, that the court

was extremely familiar with the facts of this case and the nature of the litigation, having just completed a five-day bench trial and issued a lengthy decision on the merits.

¶ 42.    The factual errors in Willard's motion, such as misidentifying petitioners' shares of Trusts 2 and 4, do not compel a contrary conclusion.  Petitioners pointed out these errors in their response to Willard's motion and, as they acknowledged in their response, the court was well aware of what share of the trusts were held by petitioners.

¶ 43.    Petitioners finally argue that the amount of the attorney's-fee award was unreasonable because it included counsel's work up to and during the probate proceeding. Petitioners did not object below to the time spent by counsel or the rates charged.  Petitioners referenced the probate proceeding in their opposition motion to support their assertion that they acted in good faith, noting that they had prevailed at the probate level.  They do not show where in the record they argued that the court should not award fees associated with the probate proceeding to Willard and we therefore do not address this argument.  The court acted within its discretion in awarding attorney's fees to Willard and we find no grounds to disturb its decision.

Affirmed.

FOR THE COURT:

_____
Associate Justice

18